ROLLIN H. HUGHES v. HERMAN SCHMIDT, Appellant.—30 S. W. (2d) 468.

Division One, July 9, 1930.

*John T. Sluggett, Jr.,* and *E. P.* and *R. C. Brinkman* for appellant.

*Mark D. Eagleton, John F. Clancy* and *Hensley, Allen & Marsalek* for respondent.

ATWOOD, P. J.—This is an action for damages for personal injuries brought by Rollin H. Hughes against Herman Schmidt. From an adverse judgment for $19,500 defendant has appealed. The only point here urged by appellant is that the verdict was excessive. As to other phases of the case, it will be sufficient merely to outline the facts.

At the time he was injured respondent was employed by appellant as a carpenter in the construction of a lumber shed. While working on a scaffold, with the construction of which he had nothing to do, the staging or board upon which the men walked and worked moved from its position, thereby causing respondent to lose his balance and fall. The carpenter who built the scaffold testified that a sixteen-penny spike had been driven part way into this board, but that it was left a little too loose and eventually worked out, leaving the end of this board loose, so that it slipped off of the other board. Appellant did not controvert respondent's claim that the boards should have been fastened. The defense was that the boards were properly nailed, and that the board in question did not come loose or fall at the time of plaintiff's injury. As to the character and extent of respondent's injuries, we quote from the testimony of Dr. Joseph C. Peden, an X-ray specialist, whose qualifications were admitted by defendant. He said that he made X-ray pictures of plaintiff's pelvis and right hip on October 7, 1927, two or three weeks before the trial, and that they

showed an old fracture involving the right hip and the socket into which the hip fitted. He further stated:

"The fracture involves this region in there and that is a—you can't trace the line, because it is a crushing fracture; there are many lines. The head of these bones—the head of the thigh bone, has been driven into the socket joint—pushed in considerably farther than is normal, and the socket itself—the whole thing which it faces, is crushed.

"Q. Now, can you by way of comparison with the opposite side there—take the left side, by the member on the right side, and show the line which normally appears and why that line is obliterated on this other side? A. The head of the bone is right on this main object in the socket of this white line; that sort of surrounds it. On this side, these relationships are all disturbed, due to the fracture lines that have entered through that line.

"Q. And when you say there has been a crushing fracture, does that word 'crushing' indicate that the fracture is more than one fracture, or a multiple of fractures? A. Yes, sir.

"Q. There are a number of fractures, then, is that the idea? A. Yes, sir."

Dr. F. G. Pernaud, whose qualifications were also admitted by the defendant, made an examination of plaintiff a short time before the trial. He said:

"I found that he had a characteristic deformity, or old fracture of the head or neck of the right femur, and I mean by fracture, a complete breaking of the bone and not a crack. The right leg measures from the point of the crest of the hip bone to the bone of the ankle bone, thirty-five and a quarter inches. The left leg, same measurement, is thirty-six and a quarter inches, showing that the right leg is one inch shorter than the left leg. The circumference of the leg, four inches above the knee, is fourteen inches. The same circumference of the left leg four inches above the knee is sixteen and three-quarters inches, showing that the right leg at that point is two and three quarters inches smaller in circumference than the left. The circumference of the right thigh at the crotch is seventeen and one-quarter inches; the circumference of the left leg at the crotch is twenty and one-quarter inches, showing that the right leg at this point is three inches less in circumference than the left leg. The right knee crepitates, and I mean by that, when it moves it grates, indicating that there is a disturbance, or destruction of the smooth membranes and membranes of the bone. The right knee cap rides slightly on the outside of the joint. There is limitation of all movements, and I mean by that, movements are incomplete; all movements of the right hip are incomplete and not full in all directions—rotation forward and backward of the right hip. A thickness of the bony structure of the right hip joint. I mean by that, the head and neck of the right thigh bone can be felt; that is, there is an increased amount of bone in this area

—in the right hip in the lateral measurement and is narrower as compared to the left."

He further stated that plaintiff was suffering from an old fracture of the head and neck of the femur, and also a crushing of the acetabulum, or the socket into which the head of the thigh bone fits; that the neck of the thigh bone or femur is the narrow portion that comes from the main shaft of bone and has a knob or head at the end, which fits into a socket in the thigh bone, this socket being about half the depth and about as round as a teacup; that a fracture at the point where the femur fits into this socket was more serious than at other points, because it involved the hip joint, which is one of the most important joints of the body; that ordinarily there was a thick, viscid substance or fluid, like the white of an egg, in the joint, which provided lubrication; that in plaintiff's case the normal line between the head of the femur and the inside of the socket had been obliterated, and at certain points of the bearing surface the bones came directly against each other, causing a grating or rubbing and producing pain; that plaintiff's injury was permanent, and was reasonably certain to continue to cause pain throughout his life; that in a condition of the kind from which plaintiff was suffering, the tendency was to develop different constitutional changes and other infections that represent acute conditions; that there was pain with every movement of the hip joint, and that this pain caused a decrease in the use of the leg, which resulted in muscular shrinkage and atrophy; that this atrophy was a permanent condition, because plaintiff never would be able to use his leg properly; that he did not think plaintiff could perform the ordinary duties of a carpenter; that he could probably sit down and work in front of a bench, but he could not perform scaffold work or high work; that he was positive the plaintiff could not do the routine work of a carpenter, to turn out an eight-hour-a-day job, six days a week, over any period of time at all; that he did not think there would be any improvement whatever in the condition of plaintiff's hip joint and leg.

Plaintiff testified in his own behalf that at the time of trial, October 27, 1927, he was 48 years of age. On August 11, 1926, when the accident occurred, he was in defendant's employ and had been working for defendant since July 1st of that year; that he was a carpenter by occupation, and was earning regularly $66 per week; that prior to the accident his health and bodily condition was perfect; that in the fall from the scaffold he was not rendered unconscious, but was dazed; that the men working with him came to pick him up and he was in such great pain that he asked the men to lay him down, but didn't know whether they did so or not; that the next thing he remembered they were trying to get him into a motor car to take him home, but he was taken to a hospital in St. Louis, where he remained for ten weeks and three days, under the attention of defendant's physicians,

Drs. Coffee and Lyttle; that he then went home, but was unable to do any work until the 16th of March, 1927; that since then his work had been very intermittent; that from March, 1927, to the time of trial, on account of his disability he had worked probably 25 per cent of the time; that the pain in his knee and hip and back kept him from working, and he was unable to climb, or to lift anything of any weight. Evidence offered by defendant corroborated plaintiff's statement as to the great pain he suffered at the time of the accident; that he was taken to the hospital, where chloroform or some other drug was administered. Defendant offered no other evidence bearing on the issue of the extent of plaintiff's injury. The physicians who treated plaintiff at the hospital, and who, it would appear were retained and paid by the appellant, were not produced.

Appellant cites a number of cases in which we have not disturbed much smaller verdicts. However, they are of little assistance because it does not follow that in those cases we would not have approved larger verdicts had the juries seen fit to return them. Respondent insists that the verdict, compared with others considered by this court, is not excessive. We present the results of a study of the cases cited by respondent in support of this contention.

In Skinner v. Davis, Director-General of Railroads, etc., 312 Mo. 581, 280 S. W. 37, we held that a verdict for $20,000 was not excessive. The plaintiff in this case when twenty-one years of age suffered a compound comminuted fracture of the tibia and fibula and a fracture in the knee joint of the right leg. The crucial ligaments binding the knee joint were torn loose from their fastenings, leaving a weak, insecure joint. There was a bowing of the tibia or shin bone where the fracture had healed and the fibula at the knee joint was half an inch out of place. There was almost complete ankylosis of the ankle and foot. There were scars along the front of the leg adherent to the shin bone which were a source of pain and over which plaintiff wore a pad. The tendon of Achilles was cut to let down the heel. The bones in the right leg were set three different times. He was in different hospitals about fourteen months and suffered much pain. There was general atrophy of the leg and foot and the leg was shortened about an inch from the knee to the ankle. Plaintiff could walk but little and then only with aid of a cane. The injuries were permanent and prevented him from performing any manual labor. There was also an injury to the left knee which left it stiff for some time. There was also evidence that four years after the accident plaintiff still suffered from excessive nervous tension, and that this condition would most likely be permanent.

In Stein v. Rainey et al., 315 Mo. 535, 286 S. W. 53, we held a verdict for $25,000 not excessive where plaintiff was wrongfully and wilfully shot, one bullet striking his arm and the other entering the left side of his back, passing through the left lung near the heart, strik-

ing a rib, glancing to the right and passing through the right side of the back. Plaintiff's lungs were severely injured, permanently impaired, and he. was permanently disabled from doing anything that required exertion, although prior to the shooting he .was a strong, able-bodied man earning $175 a month. There was also evidence that he had expended $800 for hospital and medical attention and would have to expend more.

In Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408, we held a verdict of $18,000 not excessive where plaintiff suffered a blow which resulted in an abscess and necrosis or rotting of the spinal vertebrae, so that she could neither stoop nor walk. The injury was permanent, and there was evidence of large expenditures for medical attention which would likely continue.

In Varley v. Columbia Taxicab Co. (Mo. Sup.), 240, S. W. 218, the jury returned a verdict for $75,000, which was cut by the trial judge to $40,000, by us further reduced to $18,000, and still regarded as ''a good round sum'' if not ''slightly excessive,'' after a careful review of verdicts previously considered in this court. Plaintiff suffered cuts and bruises about the head and face resulting in some scars, nose pushed a little to one side, and about fifty per cent deafness in one ear; also, five or six broken ribs and injury to the covering of the lungs, so that pleurisy would at times occur; collar bone torn out of place, resulting in permanent weakness in right arm unless corrected by future operation; permanent stiffness at the junction of the coccyx and pelvis or hip bones and the lower part of the spine, so that he could not get around and do any normal work without inconvenience. Was in hospital seven weeks. Nervousness and loss of weight were shown up to time of trial, although he had resumed his work as an expert chemist.

In Mayne v. Kansas City Railways Co., 287 Mo. 235, 229 S. W. 386, plaintiff's hip was torn from the socket, bones in the region of her hip were fractured in five or six places, resulting in an abnormal contraction of the pelvic cavity so as to make normal child-birth impossible. Some of the bones overlapped so that there was painful and defective locomotion, and one fragment of bone was thrust downward so that it was impossible for plaintiff to sit comfortably except on a pillow. She underwent treatment at a sanitarium for about ten weeks. At the time of the trial, some fourteen months after the injury, she was still on crutches, and it was the opinion of physicians that her injury was permanent with no possibility of any substantial relief. We held that a verdict of $20,000 was not excessive.

In Zumwalt v. C. & A. Railroad Co. (Mo. Sup.), 266 S. W. 717, we held that a verdict of $18,000 was a ''round sum,'' but not excessive, in view of the injury with attendant expense, pain and suffering. In that case plaintiff suffered a compound fracture of the right leg, the large bone being thrust into cinders for a distance of

probably five inches. The fracture was about two inches above the ankle and the leg twisted back. Plaintiff's face and hands and several places on his body were cut up with cinders. He was in a hospital for six weeks, suffering intense pain, and in that time was reduced in weight from 140 pounds to 87 pounds. Subsequently, he was taken to another hospital where an effort was made to graft five inches of bone on the leg. After a long period of suffering and much expense it was discovered that non-union of the bone still existed, and at the trial doctors testified that the disability was permanent and defendant's leg would never be any better.

Under the circumstances above shown it would seem that larger verdicts would there be warranted than in the instant case. The circumstances shown in Johannes v. Laundry Co. (Mo. Sup.), 274 S. W. 377, are more nearly parallel. In that case the jury returned a verdict for $28,000, the trial judge overruled motion for a new trial when plaintiff entered a *remittitur* for $15,500, and we allowed the judgment to stand for $12,500. It there appeared that the plaintiff was 46 years of age at the time of his injury and was an employee of a meat-packing company, receiving $3.35 a day. Prior to that employment he had worked as a painter and also as a pipe-fitter. He was struck by a truck, and in addition to various bruises and contusions he suffered a fracture of the left hip, that is, an impacted fracture of the head of the femur. This fracture, after plaintiff had been in a hospital seven months and in another five months, was finally reduced, but resulted in a shortening of the leg by approximately three-fourths of an inch. At the time of the trial, more than three years after the injury, he had not recovered the use of the limb. He had to drag his leg while walking, tired easily, could not go up steps, and suffered pain more or less all of the time from adhesions which had formed at the place of the fracture. It further appeared at the trial that, in addition to the specific conditions resulting from the injury to the leg, plaintiff's general health had become impaired. He was unable to do manual labor of any kind. He was at all times tired, listless and despondent; had continuous headaches; could not sleep; and suffered recurring spells of faintness. A specialist in nervous and mental diseases made an examination and found that there was a partial paralysis of the left side that in all probability would be permanent. Other ills were set forth in the testimony. In the instant case the shortening of the limb was slightly more pronounced, the fracture apparently was never reduced, and at the time of the injury according to the evidence, plaintiff was receiving more wages than in the Laundry Company case. However, plaintiff Hughes was able to accept employment for about 25 per cent of the time when the case was tried, according to the evidence might in the future consistently do bench work, and it was agreed that the knee injury was not covered by the allegations of the petition. In the

Laundry Company case plaintiff was unable to do manual labor of any kind, suffered partial paralysis and was apparently left in much worse condition than was the plaintiff in this case.

As nearly as we can ascertain, the verdict was excessive to the extent of $4,500. If, therefore, plaintiff will file a *remittitur* of that sum in the office of the clerk of this court within ten days after the filing of this opinion, the judgment will be affirmed for the sum of $15,000, with six per cent interest thereon from the date of its original rendition in the circuit court. Otherwise, the judgment will be reversed and the cause remanded for another trial. All concur.