THOMAS WEAVER v. MOBILE & OHIO RAILROAD COMPANY, a Corporation, Appellant.—120 S. W. (2d) 1105.

Court en Banc, November 16, 1938.

*Roberts P. Elam* and *Rufus Creekmore* for appellant; *Carl Fox* of counsel.

*Mark D. Eagleton* and *Allen, Moser & Marsalek* for respondent.

TIPTON, C. J.—This is an action for personal injuries under the Federal Employers' Liability Act, in which the respondent obtained a judgment in the sum of $17,000 in the Circuit Court of the City of St. Louis. The appellant has duly appealed. In Division One of this Court an opinion was prepared by STURGIS, C., who reversed the judgment. On account of a dissenting opinion of the late lamented FRANK, J., the cause was transferred to the Court en Banc and it was assigned for an opinion. Recently, it was reassigned to the writer, who is substantially adopting the facts from the opinion prepared by FRANK, J.

We think a resume of the facts developed by the evidence will facilitate our statement and discussion of the several assignments made by appellant. The applicability of the Federal Employers' Liability Act has not at any time been challenged. On May 20, 1929, the roadmaster, B. C. Hanna, traveling by a railroad motorcar, which we shall hereafter describe, went from Murphysboro, Illinois, to Cairo. It was his purpose to make the semi-annual inspection on the following day of all the bridges and trestles on appellant's main line tracks north for some distance from Cairo. Hanna took a negro employee, Essick, with him to Cairo to assist in the work and upon arriving at Cairo in the late afternoon Hanna sought out Weaver, the respondent, notified him that an inspection trip was to be made

the following day, and ordered respondent to meet him (Hanna) at a designated point at seven o'clock A. M. on the following day to accompany and assist Essick and him in the inspection work. At the same time Hanna told respondent to provide himself with the necessary "punch bar" customarily used in making these inspections. Respondent thereupon went to appellant's blacksmith shop and made a "punch bar," or "inspection bar," for his own use and one of the employees in the blacksmith shop made a similar bar for Essick. These bars were "made of steel" and were "about seven-eighths of an inch in diameter, pointed at one end and blunt at the other." Respondent's bar was 4½ feet in length and Essick's bar 4 feet in length. In making the inspection these steel bars were used in testing the timbers in the wooden portions of the bridge structure as by striking with the blunt end or thrusting the sharpened end of the bar into the wood the inspector could detect unsound or decayed timbers. The railroad motorcar upon which Hanna and Essick made the trip to Cairo, and which was assigned to transport the inspection party on the following day, was driven by a two cylinder gasoline engine. The frame, made of wood, reinforced with steel, was 4½ feet in length and 4 feet 4 inches in width; an elevated seat, 18 inches in width, ran lengthwise, in the center, and apparently the full length, of the car. The floor was made of "slats or boards," with an open space between, three "slats" on each side of the seat. The width of the space between the "outside slat and the next one was about an inch;" the other spaces "were about one-half inch." The control levers were located in and about the center of the seat with the brake lever near the left side of the seat. There were three cross pieces or "cross timbers" in the frame; the front cross piece, one "a little back of the center of the car," and the "back cross piece of the frame work," and the top or upper side of the cross pieces was about two inches above or "from the floor or slats." There was no tool receptacle on the car or place provided for storage of tools. The appellant's evidence was that the car "could not be started with its own motive power but had to be shoved off;" that it was necessary for someone to "shove it for a distance until it got started" and that this was one of the duties assigned to the negro Essick who would "push the car" along the track "until it got started and then jump on the back end." Having attempted to describe the tools and motorcar provided for the inspection trip, we come to a statement of the testimony concerning the derailment and the cause thereof.

The inspection crew proper was composed of Hanna, who was in charge, respondent, and the negro helper, Essick. A Mr. Austill, appellant's bridge engineer, accompanied them. He stated that he had "general charge of bridge work, construction and maintenance," and that he sometimes went "on inspection trips" in order to observe

repairs that had been made or which might be necessary. They traveled north from Cairo on appellant's main line, stopping the motorcar at each bridge or trestle and making an inspection. Having inspected a bridge or trestle, they would board the motorcar and ride to the next. The two "punch bars" were the only tools carried. Respondent testified: "Before we started out Mr. Hanna told Essick it was going to be his job to look after the tools and see that they were always placed back in the car and from that time when it came to putting the tools back in the car Essick did it. No one else ever did it. . . . When we came to a bridge I would take the bar off that I was going to use and the negro would take the one off he intended to use. In making the inspections the negro stayed right along with me. I would watch his inspections and determine what they revealed. After each inspection the assistant roadmaster (Hanna) and the bridge engineer (Austill) and myself would usually stop at the end of the bridge and discuss what repairs, if any, were to be made. In the meantime Essick would take the steel bars and place them back on the car. That was the course followed" after the last inspection before the derailment. After the inspection "immediately before I got hurt Essick placed the punch bar back in the car, parallel with the car; that is north and south" and "on top of the cross pieces . . . or cross timbers" (of the frame) so that lying on these cross pieces the bars were about two inches above the floor or slats." The inference from respondents' testimony is that both bars were placed and carried in the manner he describes on the west or left side of the car and to the west or left of the seat. Respondent stated that in traveling between bridges he and Essick sat on the west side of the seat with Essick at the front or north end and Austill and Hanna sat on the east side with Austill at the front or north end; or, as respondent puts it, "I rode at the southwest corner as we were proceeding north; the negro, Essick, rode at the northwest corner immediately in front of me; Mr. Hanna rode at the southeast corner and Mr. Austill at the northeast corner. . . . Mr. Austill and Hanna, as they were seated on the car, were facing northeasterly, and Essick and I were facing northwesterly." Respondent then testified that having inspected "twenty or thirty bridges that morning" they were traveling north, the four of them riding in the manner described with the punch bars in the position on the car above stated, when "the negro in shifting his position kicked the steel bar off the front end of the car and caused it to derail. There was a sudden jerk when the car hit the bar and the derailment was immediate. I was thrown off the car on the west side." The injuries sustained will be hereafter set out. There was no other or further testimony on behalf of respondent as to the cause of the derailment; the testimony of respondent's other witnesses relating solely to the nature and extent of his injuries. As against and contradictory of respond-

ent's testimony is the testimony of Hanna, Essick and Austill, who were called as witnesses by appellant. They agreed in the statement that the motorcar was driven across and stopped "on the far side of the trestle which was to be inspected and Essick would go underneath" while Hanna and Weaver inspected "on top." Hanna denied that he at any time said anything, or gave directions, to either Weaver or Essick "with reference to Essick keeping the tools" and testified that "it was the custom and practice that each man would take care of the punch bar that he used on an inspection trip and that was done on this occasion;" that when Weaver and Essick "would get off the car at a trestle to make inspections . . . each would take his bar and proceed in the usual manner" and after the inspection "each would place his own bar" back on the car; that Weaver placed his bar between the slats of the floor and kept his foot on it "in order to keep it from moving about." Essick stated that when they started on the inspection trip, "Mr. Weaver put his bar on the left side of the car and I put mine on the right side;" that after an inspection and "when we got ready to go Mr. Weaver would take his bar and get on the left side" of the car "and put it on the left side where he was and I would get on the right side" of the car "and put mine on the right side down between the slats and the cross piece . . . and put my foot on it . . . Mr. Weaver kept his bar that same way; I never put Mr. Weaver's bar on the car at any time during the inspection. Mr. Weaver did that himself" and "each man handled his own bar and each man put it back where he got it." Both Hanna and Austill testified that when riding on the motorcar, Weaver and Hanna sat on the west, or left, side of the seat, with Weaver at the front, or north, end of the seat and Austill and Essick on the east, or right, side of the seat with Austill at the front, or north. It will be remembered that the positive testimony of the respondent Weaver is that Essick and Austill sat at the front on the left and right sides respectively, and that he and Hanna sat at the back, or south, on the left and right sides respectively. The derailment occurred at a private road crossing over the railroad track and all the evidence in the case shows that it was caused by the punch bar used by respondent either falling, or, in some manner, slipping forward so as to protrude downward in front of and from the left (west) side of the car, and the sharp point or end thereof striking and becoming imbedded in the south end of one of the crossing timbers. Both Hanna and Essick testified that about a thousand feet south of the point of derailment Weaver, riding at the front on the left (west) side, called attention to a rock on the left rail ahead; that Hanna, sitting on the left side (west) at the back (south) and operating the car, "slowed the car down very slow almost to a stop and Weaver leaned out of the front of the car, on the left side, and kicked the rock off the rail" with his right foot, and at that time

the car was "almost stopped" so that it would not start off with its own power and Essick," who was riding on the right side (east) at the rear (south), "got off the back end of the car and pushed it off for a start and then jumped on the car" when it "started again." Austill in his testimony makes no mention of such an incident. Essick denied that he "pushed either of" the punch bars "off the car with his foot." Appellant put in evidence a statement in writing prepared under the direction of its attorney or claim agent on the second day following the derailment and respondent's injury and while respondent was in a hospital at Cairo. Respondent admitted that he signed this statement. He is therein recorded as saying:

"After inspecting the last bridge before the accident I stuck the point of my bar in the opening between the slats and the front timbers of the platform of the car nearest the northwest corner where I had carried it during the entire trip. Before leaving Cairo I had picked out this place for the bar as being the safest place I thought there was on the motor car in which to carry it. I tested it in this position and concluded it would not slide through the hole. . . . The last time I remember seeing my bar before the accident was shortly after leaving the last bridge we had inspected. We had gone a short distance when I observed some rocks on the rail on my side, called Mr. Hanna's attention to the obstruction and he slowed the motor car down, almost a stop but not quite. I reached down with my foot and kicked the rocks off of the rail. After I had done so I remembered noting that the bar was in the position I had laid it on the platform. That is the last time I saw it before the accident. I kicked the rocks off of the rail about a thousand feet south of the point of the accident."

The statement does not say that Essick, in any manner, came in contact with one of the bars, causing it to fall from the car. A Miss Porter testified that she had accompanied the claim agent to the hospital, was present at the interview with respondent, and "took down" what respondent said "in longhand," and that after she "wrote it down" respondent "read it over and signed it." Respondent, however, in rebuttal, denied that he made the statements ascribed to him in the writing, and said that at the time he was confined to his bed, "suffering great pain;" that when the claim agent asked him "what caused the accident," he said "the negro kicked the bar off the front end of the car and caused it to derail;" that he did not read the writing there prepared nor was he given "any opportunity to read it before it was signed;" and that he told the claim agent he "was not in any condition then" and asked him "to come back later."

Appellant's first contention is that the trial court erred in refusing its instruction in the nature of a demurrer to the evidence at the close of all the evidence in the case. The parties have restricted the controversy upon this point to the contention made by the appel-

234

lant that "there was no substantial evidence that the negro Essick came into contact with the punch bar, thereby knocking it from, and derailing the motor car, sufficient to justify submission of such issue to the jury." The undisputed evidence is that the car was derailed by one of the steel bars falling or slipping forward at the northwest corner of the car. Respondent testified that Essick was sitting at the front, or the northwest corner, of the car, and that "in shifting his position" he "kicked the steel bar off the front end of the car and caused it to derail." Thus, it will be seen that there was direct and positive testimony as to the cause of the derailment; that the proof is not dependent upon circumstantial evidence or upon any inference and the respondent, in no way, had to resort to conjecture or speculation as to its cause. As this action is under the Federal Employers' Liability Act, the test announced by the decisions of our Federal courts in ruling the sufficiency of the evidence on a motion for a directed verdict is to be followed. The rule is that if there be no more than a scintilla of evidence to support the charge of negligence, the demurrer must be sustained. The Federal cases cited by the appellant deal largely with the principles governing the determination of the sufficiency of the evidence in cases wherein plaintiff is unable to produce direct and positive evidence to sustain the negligence alleged but relies upon inferences from the facts and circumstances developed in evidence as against the positive testimony offered. by the defendant or where it appears that the evidence "leaves the matter in the realm of speculation and conjecture." [Chicago, M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472; Small Co. v. Lamborn & Co., 267 U. S. 250; Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333.] But respondent testified that he observed Essick, as he was "shifting his position," come in contact with the steel bar and "kick" it "off the front end of the car." This is direct and positive testimony and does not become insubstantial testimony or a mere scintilla of evidence because of the fact that three witnesses for the appellant testified to the contrary. The "fact that several witnesses contradict a party's unsupported statement does not make his statement a mere scintilla of evidence." [23 C. J., p. 9.] "No matter what may be the rule as to positive direct evidence precluding contradicting inferences, there is no rule of either our courts or of the Federal courts as to a clear conflict in the direct testimony of witnesses of opposing parties, whereby the positive direct testimony of one party's witness or witnesses, as to facts, can be disregarded by the court, and the other party's directly contradictory testimony, as to the same facts, be substituted therefor because of numerical superiority, greater weight, or higher credibility of his witnesses, for the purpose of determining the facts to which it will apply the law in ruling on a demurrer to the evidence. The United States Supreme Court clearly recognizes this in the Chamberlain case, saying: 'Where

there is a direct conflict of testimony upon a matter of fact, the question must be left to the jury to determine, without regard to the number of witnesses upon either side.' '' [Hardin v. Illinois Central Railroad Co., 334 Mo. 1169, 70 S. W. (2d) 1075.]

■ Appellant tacitly concedes that if the derailment was caused as stated by respondent, it would be liable under the Federal Employers' Liability Act; however, it contends that respondent's evidence must be rejected as unbelievable, i. e., unworthy of belief, and its evidence accepted as the only true version of the happening, and that the determination of the demurrer must be made upon the testimony of its witnesses. We agree that there is authority to the effect that we have the power to set aside a judgment and grant a new trial in spite of a jury verdict when the judgment is palpably and unquestionably wrong, a clear case of injustice and unsupported by any believable evidence. This is true even if the unbelievable evidence is not contrary to the physical facts. The appellate courts ''may properly reject evidence which is contrary to the physical facts or to known physical laws, or which is the result of evident mistake or ignorance, or, in short, when the evidence itself, or the other established facts, discloses its inherent infirmity. In doing this, however, the court does not weigh the evidence in the judicial sense of that term.'' [Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079, l. c. 1082.] To the same effect are the following cases: Whitsett v. Ransom, 79 Mo. 258; Jones v. St. Louis-San Francisco Ry. Co., 287 Mo. 64, 228 S. W. 780; Schreiber v. Andrews (Mo. App.), 234 S. W. 862; Garrett v. Greenwell, 92 Mo. 120, 4 S. W. 441.

■ But we do not think this is a case where the respondent's evidence is so unbelievable as to say that it is insubstantial. The respondent's evidence, standing alone, makes a case by direct and positive testimony. It is not contended that the respondent's testimony alone is against the physical facts. It is only when weighed with the appellant's evidence that appellant contends that it is unbelievable. In other words, if the appellant had stood on its demurrer at the close of the respondent's evidence, there is no doubt that the evidence would have been sufficient to go to the jury. The respondent's credibility and the credibility of the witnesses for the appellant was for the jury.

Appellant says that it is conceded that Hanna was operating the motorcar and that the most convenient position for the operator would be at the rear, or south, of the left side of the seat where Weaver says he was sitting, and if Hanna had been seated at the south end of the seat on the right side it would have been ''inconvenient'' for him to operate the car from that position. It will be recalled that this seat was about 4 feet in length and but 18 inches in width; that the control levers were located in the center of the seat with the

brake lever coming up through the seat immediately to the left of the control levers. It would seem, from the picture of the car in evidence, that the car could have been operated from any position on the seat, it being but a matter of operating the levers. It may be true that it would be more convenient for the operator to sit on the left side and at the rear of the seat, but we certainly cannot say that it was impossible to operate the car from other positions on the seat, or that it was not operated on this occasion by Hanna while seated in the position in which the respondent says he was. Another argument on the facts is that the car was started by pushing it for a short distance and that Hanna said that he had assigned Essick to do that, and that necessarily Essick's position would have had to be at the rear to properly perform that task. There is nothing in respondent's testimony concerning this feature and he was not at any time asked about it. This small light car could doubtlessly be easily moved along the rails by pushing it. The jury might well have believed that any of the parties could have pushed it in starting from the side or toward the front and then stepped upon the car near the front thereof or at the side as well as the rear; nor was the jury required to believe that Essick alone performed that function. It is simply the testimony of one witness, the respondent, as against the contradictory testimony of three witnesses. In Atchison, Topeka & Santa Fe Railroad Co. v. Condos, 30 Fed. (2d) 669, 670, the Circuit Court of Appeals for the Eighth Circuit says: "The fact that one witness (the plaintiff) is contradicted by many other witnesses does not make the weight of the evidence so decidedly preponderant in favor of one side that a verdict contrary to it would be set aside." The court then quotes from United S. S. Co. v. Barber (C. C. A.), 4 Fed. (2d) 625, as follows: " 'The testimony of the plaintiff himself fully supports the verdict and judgment. Its truth or falsity was a question for the jury. In this connection it is urged on behalf of the plaintiff in error that the testimony of the plaintiff, in all matters material to a recovery, is specifically contradicted by a number of witnesses who had at least equal, if not better, opportunity than plaintiff to know the facts. This has no application to the sufficiency of the evidence, but, on the contrary, involves the question of the weight of the evidence, and for that reason cannot be considered or determined by this court.' " [See, also, Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521, 45 Sup. Ct., 169, 69 L. Ed. 419; U. S. Express Co. v. Wahl (C. C. A.), 168 Fed. 848; Union Pac. Railroad Co. v. James, 163 U. S. 485, 16 Sup. Ct. 1109, 41 L. Ed. 236; Patterson v. Jacksonville Traction Co. (C. C. A.), 213 Fed. 289.] " Since respondent's testimony is not contrary to physical laws or the physical facts, nor inherently contradictory or false, his credibility and the weight properly to be given to his testimony were for the jury. [Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521.] The rule is too well established and gen-

erally recognized, by the Federal courts as well as our own, to necessitate any extensive citation of authorities that when the determination of an issue depends upon the credibility of the witnesses and the effect or weight of the evidence defendant is not entitled to a directed verdict but such issue should be submitted to the jury for a finding thereon; and, as said in Chesapeake & Ohio Ry. Co. v. Martin, 238 U. S. 209 (cited by appellant), concerning the ruling on a demurrer to the evidence: "The court must resolve all conflicts in the evidence against the defendant."

Appellant would have us weigh respondent's testimony against the written statement signed by the respondent a day or two after the accident. Respondent in rebuttal denied that he made these statements ascribed to him in the signed statement, and testified that at the time he was confined to his bed "suffering great pain;" that when the claim agent asked him "what caused the accident," he said, "the negro kicked the bar off the front end of the car and caused it to derail;" that he did not read the statement, nor was he given an opportunity to read it before it was signed; and that he told the claim agent he "was not in any condition then," and asked him to "come back later." Even if the respondent made this statement to the claim agent without any explanation (which is not the case here), it would be a question for the jury. It would be a question for the jury to determine if this extrajudicial statement were true, or if his testimony given at the trial were true.

In the case of Sugarwater v. Fleming, 316 Mo. 742, l. c. 752, we said:

"It is suggested that the plaintiff was concluded by statements in his deposition on the theory that that was a judicial admission against interest. Upon reading that deposition we do not find that it clearly admits the facts claimed for it by the appellant. But if it did, it would not be conclusive. It was offered by the defendant in contradiction of his testimony. If it squarely contradicted his testimony it was a question for the jury to say whether his testimony was the truth or whether it was discredited by his deposition."

Upon this record, and the issue presented and urged by appellant, i. e., whether there is any substantial evidence tending to show that Essick came in contact with and thereby caused the steel bar to fall or slip from the motorcar, we think the trial court correctly refused the demurrer to the evidence.

Appellant next complains that the trial court erred in giving respondent's Instruction No. 1 because the instruction included and submitted appellant's negligence in furnishing a car without a tool box or receptacle for the storage of tools. The instruction conditions a verdict for the respondent upon a finding by the jury of certain preliminary facts, the propriety of which are not questioned, and that "on said occasion" appellant was negligent in furnishing and providing a motorcar "which had no receptacle for tools" "*and* that

the negro employee of the appellant who was riding upon said motorcar did come in contact with one of the said tools known as a punch bar;'' that ''by reason thereof, said punch bar was caused to fall from said motor car and to derail same;'' that ''said negro employee of the appellant in thus coming in contact with said punch bar under the circumstances aforesaid was guilty of negligence'' and that ''plaintiff was injured as a direct result of the aforesaid negligence on the part of the defendant and its employee aforesaid.'' (Italics ours.) When appellant's given Instruction No. 4 is considered and read in conjunction with respondent's Instruction 1, it appears that respondent was denied a recovery unless the jury found that Essick, appellant's negro employee, negligently came in contact with the punch bar, causing it to fall from the motorcar and derail the car. Appellant's said instruction is as follows:

''Unless the jury find from the evidence that Will Essick negligently allowed his foot to come in contact with the punch bar mentioned in the evidence, causing it to fall from the motor car and derail the same, your verdict must be for the defendant.''

Thus, Essick's negligence is made the decisive issue, and appellant's instruction very concisely tells the jury that respondent cannot recover unless they find the employee Essick was negligent in the manner set out. There is no conflict in the instructions and since respondent's Instruction 1 is drawn in the conjunctive, the requirement thereof that the jury find the motorcar ''had no receptacle for tools'' and that appellant was negligent in furnishing same without such receptacle imposed an additional burden upon respondent and required him to prove more than it was necessary to show in order to recover. Appellant argues that respondent assumed the risk arising from the use of a car which was not equipped with a tool receptacle and that the inclusion of such alleged negligence in respondent's Instruction 1 was reversible error. The argument would have force if a verdict for respondent based on that ground alone had been authorized or permitted, but as the jury are required by the instruction not only to find that appellant was negligent in that respect, but further and in addition thereto, that Essick was negligent as set out in both respondent's Instruction 1 and appellant's Instruction 4, the inclusion of negligence in furnishing a car which was not equipped with a receptacle for tools did not involve an error of which appellant can complain or which would appear to have been prejudical to appellant. [Wolfe v. Payne, 294 Mo. 170, 241 S. W. 915; Callicotte v. Rock Island Ry. Co., 274 Mo. 689, 204 S. W. 528; Gibler v. Quincy, O. & K. C. Railroad Co., 129 Mo. App. 93, 107 S. W. 1021; Chambers v. Hines, 208 Mo. App. 222, 233 S. W. 949; Moyer v. Chicago & A. Railroad Co. (Mo.), 198 S. W. 839, 842.]

Appellant offered Instruction M, refused by the court. This action of the court is assigned as error. The instruction was that

"the sole issue of negligence . . . for the jury's determination is whether Essick came in contact with the punch bar . . . and caused it to fall off of the car and derail same;" that "the burden of proof as to this issue is upon plaintiff;" and that "unless" the jury "find . . . that plaintiff has . established by the greater weight of the evidence that Essick . . . caused the said punch bar to fall out of said car and derail same . . . . the verdict must be for defendant." The instruction is, in effect, repetition and re-iteration in a somewhat different form of statement of matter presented in appellant's given Instructions 4 (supra) and 6. As we have noted, by appellant's given Instruction 4, above set out, the jury were forbidden to return a verdict for respondent unless they found Essick was guilty of negligence as therein and in respondent's Instruction 1 specified, while appellant's given Instruction 6 told the jury that "defendant is not an insurer of the safety of its employees" and that "the mere fact plaintiff was injured . . . . is not alone sufficient to entitle plaintiff to recover . . . but, on the contrary, in addition to proving that the plaintiff was injured the burden is upon plaintiff to establish . . . negligence on the part of defendant . . . by the greater weight of the evidence." The refusal of appellant's Instruction M was not error, since the substance of the propositions incorporated therein is contained in its Instructions 4 and 6.

■ Complaint is also made of the refusal by the trial court of appellant's offered Instruction L. That instruction was a statement in reference to assumption of risk but did not tell the jury the effect thereof or how the proposition therein declared was to be applied or considered by them. The instruction reads: "The Court instructs the jury that under the law and the evidence in this case the plaintiff assumed the risk of the failure of the defendant to furnish a place for the punch bars on the motorcar or to secure them so they would not shift or move thereon." Respondent's Instruction 1, supra, required, in order for the jury to render a verdict for the respondent, that they find that Essick negligently "came in contact with . . . a punch bar and by reason thereof said punch bar was caused to fall from said motorcar," etc., and appellant's given Instruction 4, supra, told the jury the verdict must be for appellant unless they found that Essick was negligent in the manner specified. (If the jury followed these instructions, and we must assume they did, their verdict could not have been arrived at on the ground that the appellant negligently failed to furnish a car equipped with a receptacle for the storage of tools. In view of the way the case was submitted, we are inclined to the conclusion that the appellant was not prejudiced by the refusal of the instruction.

■ In the early part of the direct examination of respondent, he was asked: "Was the motorcar you had that morning the regular

motorcar that you ordinarily worked on?'' The appellant objected on the ground that the allegations of the petition ''relate only to this motorcar here in question . . . and there is no allegation in the petition to justify evidence of this sort;'' the objection as made was also as to ''any testimony with reference to any other motorcar used by him on previous occasions, or other occasions than this one.'' The objection being overruled, respondent answered: ''No, sir . . . we had not used this particular motorcar on previous days. The day of the accident was the first day I had used it.'' Appellant says the admission of this testimony was error. In considering this record as a whole, we are impressed with the thought that this testimony, which apparently was of a preliminary character, could have had but little influence or effect in the determination of the real issues involved. However, it will be remembered that one defense interposed was ''assumption of risk'' and the testimony was perhaps competent as bearing in some measure on that issue. Further, in the cross-examination of Essick, substantially the same matter was developed without objection, and again touched upon in re-direct examination. Under such circumstances, it does not appear that appellant's rights could have been prejudicially affected.

The last and only remaining assignment made by appellant is that the judgment, after *remittitur*, is excessive. It will be recalled that the judgment appealed from, entered after a *remittitur*, is for $17,000. At the time of trial, approximately two years had passed since the date of the injury. At the time of the injury, respondent was fifty-four years of age and in good health. He had for some time theretofore ''worked steadily, earning wages of $135.00 per month.'' He was confined to a hospital ''for a little over two months and a half after the accident.'' Respondent had no hospital or other medical expenses. He testified that since receiving the injury he ''had not been able to do any work.'' He sustained a ''comminuted, or crushing, fracture of the upper end of the tibia or large bone'' of the left leg just below the knee ''with several large fragments and the lines of fragments entering the knee joint itself.'' Dr. F. D. Pernoud, as a witness for respondent, testified that he first ''examined plaintiff April 30, 1930,'' approximately eleven months after the date of the injury; that at that time he found respondent ''limped favoring the left leg'' and ''walked with the assistance of a heavy cane;'' there was an ''enlargement and thickening of the bony structure about the left leg just below the knee joint involving the lower part of the knee joint. Most of the thickening was due to increase of bony structure. The left knee joint was distended with fluid,'' a condition commonly spoken of as ''water on the knee joint.'' The witness, continuing his statement of findings at this first examination, testified: ''There was a grating, vibration and noise when the left knee joint was moved backward and forward . . . the

leaders and ligaments that bind the bone of the thigh to the bones of the leg have been stretched so that instead of having just backward and forward motion in knee joint . . . he can stand on his foot and rotate the lower part of the knee joint which is not normal motion. . . . There is a bowing of the left leg below the knee due to a displacement of the fractures just below the left knee." The left leg is shorter than the right. "There was tenderness on pressure over his sacrum . . . There was tenderness on pressure over the lower vertebrae of the spine known as the lumbar spine . . . and over the large muscles commonly known as loin muscles, one on each side of the middle of the spine." The doctor then stated that he made another and second examination of respondent on June 11, 1931, five days before the trial, and at that time found "the motion in his left knee joint was poorer than it was before" and that "in all other respects the conditions were the same" as found on the first examination; that in his opinion respondent's injuries "disabled him from following manual pursuits . . ." and that respondent would suffer pain "about his knee joint and in his back . . . throughout his life;" that the injuries he had described "are of a permanent character;" and that respondent "would have to continue in the future to use artificial means of support." Respondent complained of pain in his "back, spine and left hip" and stated that when he "used the leg any length of time" the "knee joint became sore" and "the leg swells up." The X-Ray pictures "of the entire lumbar spine in the region of the back complained of" did not show "any evidence of injury but shows some slight tilting of the pelvis." This condition is explained by a physician who testified for appellant as causing "the backache because he has drooped over due to this shortening (of the left leg) and he leans over, . . . favors one side and that throws the muscles of the back out of line. Respondent's witness, Dr. Pernoud, said: "It is my judgment that he has a stretching and tearing of leaders and ligaments which bind the vertebrae in the back part of the pelvis and the left leg being shorter than the right, the thud of walking and going down on that side creates a greater motion in the back than would be normal if the leg was of normal length so that he suffers greater pain in his back than he would if the defect did not exist." At the time of the trial, respondent weighed 200 pounds; was "well muscled and nourished;" "heart and lungs were all right;" and "there was no evidence of injury or disease in the nervous system" or bodily impairment or disorders except the leg injury and the back condition, which the evidence on the part of respondent tended to show. It does not appear that respondent's injuries are such as to render him entirely unable, in the future, to perform certain kinds and forms of remunerative work which might well be assumed to be within the range of his capacity. Looking to precedent, and our former and rather recent rulings, on very

similar facts as to injuries sustained, we refer first to Davis v. Buck's Stove & Range Co., 329 Mo. 1177, 49 S. W. (2d) 47. In that case, the trial court caused the verdict for $35,000 to be reduced to $20,000. At the time of the injury, the plaintiff was thirty-five years of age, "sound and in good health and earning about $150 a month at his vocation of locomotive fireman." He suffered a fracture of the leg between the knee and hip joint. "The bones at the fracture overlapped" resulting, as here, in "the leg being somewhat crooked." Later, another operation was performed by "rebreaking the fracture, taking out a short section of the bone and resetting it in better alignment. It then healed but left the leg shorter than the other, and in walking plaintiff's foot has a tendency to turn inward. The knee was left somewhat stiff. At the time of the trial, plaintiff had not worked any, walked with a cane, and is incapacitated from following his vocation of fireman or any work requiring much use of this leg. He suffered considerable pain and claimed at the time of the trial that he suffered and had continued to suffer pain in his hip and back "owing largely to his leg being shortened." We said: "It is quite certain, however, that he is in much better condition physically than if the injury had necessitated an amputation of the leg. If we are to be guided by the principles and precedents of such cases as (cases cited) and allowing for the earnings already lost by plaintiff and his rather heavy medical and hospital expenses and his probable continued suffering, we are constrained to hold that $15,000, as of the date of the original judgment, is all that should be allowed." We observed that in the instant case hospital and medical expense is not involved as an element of damages to be considered. The following excerpt from Cole v. St. Louis-San Francisco Railroad Co., 332 Mo. 999, 1011, 61 S. W. (2d) 344, 347, assigns the basis for the *remittitur* ordered in the amount of $20,000, reducing a judgment for $30,000 to $10,000: "Plaintiff alleged an injury to his kidneys *and the loss of the lower part of his left limb from a point seven inches below the knee.* . . . Up to the time of the trial he was under the care of several physicians of defendant. He testified that on slipping from the ladder he fell on his hips, and back, and at times thereafter experienced severe pain on his left side, hip, and back. He further testified that he experienced no such pain prior to the injury. . . . The only medical evidence in the case was as to the condition of his kidneys. A physician examined him on the eve of the trial for the purpose of testifying as a witness. He testified that plaintiff was suffering from a displaced kidney, but he did not testify that it was or could have been caused by the injury. The evidence as to the cause or extent of this alleged injury is not satisfactory. At the time plaintiff was twenty-seven years of age and earning $200 per month. Of course he cannot follow the vocation of brakeman, and is entitled to pecuniary damages. He was at no expense for hospital

services and physicians. On the record we think his recovery should not exceed $10,000." (Italics ours.) In Hughes v. Schmidt, 325 Mo. 1099, 30 S. W. (2d) 468, apparently the same doctor who made the examination of and testified as a witness for respondent in the instant case testified as to the injuries and conditions resulting as found by him upon examination of the plaintiff. The plaintiff in that case was a carpenter, forty-eight years of age and earning $66 per week. He sustained "a crushing fracture" of the "head and neck, of the femur and also a crushing of the acetabulum or the socket into which the head of the thigh bone fits." The doctor said: "A fracture at that point was more serious than at other points because it involved the hip joint;" the right leg was shortened one inch; there was crepitation of the right knee (as in the instant case, "grates when it moves"); a thickening of the bony structure of the right hip joint and a limitation of all movements; "there was pain with every movement of the hip joint;" "muscular atrophy;" plaintiff "could probably sit down and work;" plaintiff's condition was permanent and there would not be "any improvement whatever in the condition of plaintiff's hip joint and leg." The judgment for $19,500 was held to be excessive by $4,500, and a *remittitur* in that amount ordered, reducing the judgment allowed to $15,000. The injury to the leg and resulting conditions found in Johannes v. Edward G. Becht Laundry Co. (Mo.), 274 S. W. 377, afford some basis of comparison. The plaintiff in that case was forty-six years of age at the time of the injury, earning $3.35 a day. In addition to various bruises and contusions, he suffered a fracture of the left hip, that is, an impacted fracture of the head of the femur. This fracture, after plaintiff had been in one hospital seven months and in another five months, was finally reduced, but resulted in a shortening of the leg by approximately three-fourths of an inch. At the time of the trial, more than three years after the injury, he had not recovered the use of the limb. He had to drag his leg while walking, tired easily, could not go up steps, and suffered pain more or less all of the time from adhesions, which had formed at the place of the fracture. It further appeared at the trial that, in addition to the specific conditions resulting from the injury to the leg, plaintiff's general health had become impaired. He was unable to do manual labor of any kind. He was at all times tired, listless, and despondent; had continuous headaches; could not sleep; and suffered recurring spells of faintness. A specialist in nervous and mental diseases made an examination and found that there was a partial paralysis of the left side that, in all probability, would be permanent. Other ills were set forth in the testimony. Plaintiff had a verdict for $28,000, which was reduced by *remittitur* in the trial court to $15,500, but a further reduction of $3000 was here ordered and a judgment for $12,500 allowed. See, also, the facts concerning the injuries in Spencer v.

Quincy, O. & K. C. Ry. Co., 317 Mo. 492, 297 S. W. 353, where a judgment for $41,375 was reduced by this court to $10,000. The respondent in the instant case says that he was unable from and after the date of the injury to resume his former vocation in railroad work or do any kind of work, and that he had, to the date of the trial, lost wages in the amount of $3000. With the cases we have above specifically referred to and briefly reviewed, and the cases cited in Davis v. Buck's Stove & Range Co., supra, as precedents, we are constrained to hold that the judgment for $17,000 herein is excessive by $6000. If, therefore, respondent will, within ten days, enter a *remittitur* of $6000, the judgment will stand affirmed for $11,000 as of the date of the original judgment; otherwise, the judgment will stand reversed and the cause remanded for a new trial. *Lucas, Ellison* and *Leedy, JJ.,* concur; *Gantt, J.,* dissents in separate opinion; *Hays, J.,* dissents and concurs in dissenting opinion of *Gantt, J.; Douglas, J.,* not sitting because not a member of the court when cause was submitted.

GANTT, J. (dissenting).—Action for personal injuries under the Federal Employers' Liability Act. Judgment for $17,000 and defendant appealed.

The petition alleged (1) that the defendant negligently failed to provide the car mentioned in the principal opinion with a receptacle for tools; (2) that it negligently failed to secure the tools on the car; (3) that Essick, co-employee of plaintiff, negligently came in contact with a tool on the car, causing the same to fall from the car and derail the same, thereby causing plaintiff to be thrown from the car and injured. The first two allegations of negligence are not for consideration. The cause was submitted to the jury solely on the third allegation of negligence.

The motorcar in question was made of wood, reinforced with steel. It is five feet in length and four feet and four inches in width. An elevated seat eighteen inches in width runs lengthwise in the center the full length of the car. The floor consisted of three boards on each side of the seat. The width of the space between the outside board and the next board is about an inch. The other spaces between the boards is about one-half inch. There are three cross timbers in the frame of the car, consisting of the front, the center and the rear timbers. The top of these cross timbers is about two inches above the floor of the car. In other words, the floor of the car did not rest on the top of the cross timbers.

In Division One the opinion of STURGIS, C., reversing the judgment on the ground of no substantial evidence to sustain the verdict, was adopted. FRANK, J., dissented and adopted as his dissenting opinion that part of the opinion of FERGUSON, C., which ruled that there was substantial evidence to sustain the verdict. In this situation the

cause was transferred to the court en banc. Recently the cause was reassigned to TIPTON, C. J., who has submitted for consideration an opinion affirming the judgment. In said opinion the Chief Justice substantially adopted the facts from the dissenting opinion by FRANK, J., and affirmed the judgment. In doing so he adopted the facts considered by FERGUSON, C., in ruling the question of whether there was substantial evidence to sustain the verdict.

In the course of said opinion the Chief Justice states that "if the appellant had stood on its demurrer at the close of the respondent's evidence, there is no doubt that the evidence would have been sufficient to go to the jury." Everyone will agree to this statement. But that is not the question for determination. The question is whether or not there can be found in the record any substantial evidence to sustain the verdict. In other words, is there believable evidence to sustain the verdict? In determining said question it is not only proper but necessary to consider all the facts and circumstances in evidence. In doing so the Chief Justice admits that we do not weigh the evidence in the judicial sense of that term. He also admits that a judgment may be set aside regardless of a jury verdict, even though the unbelievable evidence is not contrary to the physical facts. The only evidence to sustain the charge of negligence submitted to the jury was given by the plaintiff.

STURGIS, C., ruled that the testimony of the plaintiff with reference to said allegation of negligence was unbelievable. FERGUSON, C., ruled that the jury would be authorized to believe the evidence of plaintiff on the question. On the question the Chief Justice states that "we do not think that this is a case where the respondent's evidence is so unbelievable as to say it is insubstantial." In making said statement he admits that the evidence is unbelievable. But he thinks that it is not *so* unbelievable as to be worthless. The evidence is either believable or it is unbelievable.

In ruling the question the Chief Justice gave no consideration to uncontradicted evidence as follows:

B. C. Hanna, assistant roadmaster, testified as follows: "The car suddenly derailed at a private road crossing. As to this crossing there was a four by ten board on each side of each rail in order that wagons and vehicles could pass on it. The boards were about twelve feet long and the bar fell off at that place. The bar stuck into the end of the board. There was a hole or a gouge right in the end of the board. It was beveled and the gouge was right in the end of the bevel almost at the top of the board, about an inch from the top of the board, and then it was scarred about six inches beyond the gouge or the hole. The gouge or hole was about three inches from the west rail of the track, and it was in one end of one of those planks—the inside board.

"The pictures, defendant's exhibits three and four, correctly show

the situation there—the crossing, the planks and the hole in the planks. Defendant's exhibit four is a picture showing the crossing in question and the gouge or hole formed by the bar punching in the bevel. That hole is right on the west side of the track—about three or four inches from the west rail; right in one of the ends of those planks.

"After getting the injured men away, I immediately determined to follow them in the car to make some disposition of the car. I had, of course, to move it off the track, and when I got ready to get it on the track found this bar that was on the left side sticking down between the cross beam and the iron strip in the extreme northwest corner of the car. It was bent at an angle of about ninety degrees in such a way that I had to work it around to get it out. I got the bar out and put the car on the track and proceeded towards Tamms. Yes, the bar I found was between the slats and that cross beam on the top. There was a little iron strip underneath. The bar had rolled through a hole between the cross beam and this iron strip and bent back under the car. The bar that was found in the northwest corner of the car as described after the derailment was the bar used by Mr. Weaver (plaintiff) which was the longer and smaller bar."

Will Essick, co-employee of the plaintiff, testified as follows: "I remember about the derailment. It was done so quick I couldn't state how it was done until we had got on the ground. When we got on the ground I said: 'What in the world is the matter.' And Mr. Hanna said: 'That bar worked through a car.' I saw the hole that the bar made in one of the planks in the crossing after the accident. I saw the bar that was on Mr. Weaver's (plaintiff) side. It was bent at an angle. I saw the bruises of the wood were on the northwest corner of the car. The bar was bent at right angles, not plumb square, and there were scratches on the northwest corner. It was bent between the front beam and the slats and that piece of iron underneath. The photograph, plaintiff's exhibit four, shows the hole in the plank where a punch bar struck it, right at the south end of the plank that runs parallel with the railroad. I saw that hole at the time."

H. Austill, bridge engineer, testified as follows: "After I got up we looked around and the punch bar on the left side was badly bent. The crack in the floor between the floor planks and the west sill of the car showed that the bar had gone forward through the crack. The bar was bent somewhere near right angles or square. There were scars or bruises on the northwest corner of the car where we found the punch bar bent."

This evidence, considered with the other evidence in the case, conclusively shows that the plaintiff was not injured by a bar kicked from the front end of the car by Essick. If so, there is no substantial evidence to sustain the verdict. In other words, plaintiff's

testimony on the question is unbelievable. If Essick kicked a bar from the front end of the car (which I do not believe), it is clear that said bar did not cause the derailment. The derailment was caused by a bar slipping forward through an opening in the floor and through an opening between the steel reinforcement and the front cross beam. This movement of the bar did not interfere with the movement of the car until the car reached the private road crossing. At this place the point of the bar came in contact with the crossing board, which caused the derailment. For these reasons I respectfully dissent. *Hays, J.,* concurs.