BRIDGET A. LYNCH, administratrix, *vs.* NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

Worcester.    January 9, 1936. — March 31, 1936.

Present: RUGG, C.J., CROSBY, FIELD, LUMMUS, & QUA, JJ.

*Negligence*, Employer's liability, Railroad, Res ipsa loquitur.

Under the Federal employers' liability act, no action lay against a railroad corporation for the death of an employee engaged in interstate commerce resulting from the derailment of a motor work car from an unknown cause.

The doctrine *res ipsa loquitur* could not be invoked at the trial of an action against a railroad corporation under the Federal employers' liability act for death resulting from the derailment of a small motor work car within the control of the decedent if on the evidence the accident might have been due solely to negligence of the decedent.

TORT by the administratrix of the estate of Thomas Lynch. Writ dated December 30, 1930.

The action, which by an amended declaration set forth a cause of action under the Federal employers' liability

act, was tried in the Superior Court before *Whiting*, J.   A verdict for the plaintiff was recorded subject to leave reserved under G. L. (Ter. Ed.) c. 231, § 120.   Thereafter a verdict for the defendant was ordered entered.   Both parties alleged exceptions.

*R. W. Lewis*, (*H. H. Hartwell* with him,) for the plaintiff.

*Joseph Wentworth*, for the defendant.

CROSBY, J.   This is an action of tort brought by the plaintiff to recover for the conscious suffering and death of her late husband, Thomas Lynch (hereinafter referred to as Lynch), while he was in the employ of the defendant. The action was brought under the Federal employers' liability act (35 U. S. Sts. at Large, 65, c. 149, 36 U. S. Sts. at Large, 291, c. 143; U. S. C. Title 45, §§ 51–59) against the defendant, and was tried on a substitute declaration. The defendant's exceptions relate solely to the allowance of the plaintiff's substitute declaration.

The jury returned a verdict for the plaintiff in the sum of $5,000 on the count for death, and $500 on the count for conscious suffering.   The verdict was recorded by the judge subject to leave reserved under G. L. (Ter. Ed.) c. 231, § 120.   Thereafter the defendant filed a motion for the entry of a verdict in its favor, which was argued, and a verdict for the defendant was entered accordingly.   To the allowance of the motion and to the entry of the verdict, the plaintiff excepted.   It was agreed by counsel at the trial that the plaintiff was the duly qualified administratrix of the estate of the deceased, and that the deceased, at the time of the derailment which resulted in his death, was employed by the defendant in work constituting interstate commerce.

There was evidence as follows: On the day of the accident Lynch was about fifty-three and one half years of age.   He was a strong, healthy man, and his wife and four of his children were dependent upon him for support.   He had been employed by the defendant for thirty-one years preceding his death, and had been its section foreman for the past twenty-eight years.   He was foreman of the section from North Webster in this Commonwealth to Grosvenor-

dale, Connecticut, which included six miles of single track. Lynch was regarded by his superior officers as a faithful employee. On July 11, 1930, the morning of the accident, as section foreman he took four men with him from Webster to go to Grosvenordale, to change a cracked rail. They were as follows: Frank Pecherina, a track walker, Thomas R. O'Brien, Harold Chandler, and a man named Kalwarczyk, who was called Smitty. To make the trip they used a small motor car operated with a gasoline engine and a clutch, the same as an automobile, and a foot brake. There was evidence that this motor car was purchased by the defendant in April, 1930, about three months before the accident.

O'Brien described the car as follows: "We had sheet metal come out in front, there was a bar which ran lengthwise which we sometimes used to hang onto. Up in front on both sides where the tools went was a piece of sheet metal stuck up there. It sort of worked up higher than the boards at the front of the tool boxes as shown in the picture, on the same principle but it was higher up. . . . The car had a lever something like that shown in Exhibit A for Identification and there was a foot brake and a throttle. It did not have a seat like that in the picture. It had an automobile seat with a back to it. . . . The tool boxes on our car had braces on the side. It had flanged wheels." This witness further testified that in his opinion the car weighed eight hundred or nine hundred pounds; that it could be lifted on a turntable and run on and off the track whenever they stopped for work; that the driver's seat was on the left side where the lever was for operating the car; that in the car that morning there were rail tongs and other articles including four shovels and two picks; that on the way they picked up two iron lining bars about five feet long and used for straightening rails, lining the track, and putting in ties; that they had with them a turntable and a telephone; that the tools were such as they usually carried when they went to change a rail; that when they left the station at North Webster Lynch was operating the car, facing the front, Smitty was sitting on

the left side behind Lynch, and the witness was sitting on the right side facing toward the French River, which is shown by a picture annexed to the plaintiff's substitute bill of exceptions and was parallel with the railroad track; that in front of him on that side was Chandler, and the other man in front was Pecherina, who was killed, and who made it a rule to look over the track as he went along as a lookout; that they came to a curve, and passed around it, and it seemed "as though the car vibrated and shook, and we dropped and came on an angle this way, the motor car going in the river, and I went in. Mr. Lynch on this side of the track, and Mr. Pecherina was over here." This witness further testified that the car shook up and down; that it started to shake as they got around the curve for about six rail lengths, or one hundred and eighty feet, before it left the track, and after it left the track it travelled about a rail length, and went into the river; that two months before the accident happened an angle bar fell off the back of the car; that at the time of the accident the car was travelling about twenty miles an hour, and that was about the normal speed; that he had never known the car to shake as it did on the day of the accident; that Lynch was thrown onto the left rail of the track; that Pecherina's body was near a culvert; that he (O'Brien) went into the river past Pecherina; that he saw nothing on the track before the accident. This witness testified on cross-examination that Lynch was his foreman, and attended to the motor car, and had full charge of it; that he always operated it, saw that it was properly oiled, and decided when it was to be used; that the first time the witness noticed anything wrong on the day of the accident was after they came out of the first curve in the track; that there were three curves; that after the car left the track it went the length of five or six rails before it went into the river, "It seemed as though it trembled, and then leap, and then drop in between the rails"; that it went along the middle of the track and into the river, "One wheel inside and the other wheel outside. . . . Two outside and two inside"; that before the witness felt the car drop he

heard Lynch ask what happened; that the motor car seemed to be in good condition until this accident occurred; that he saw Lynch put his foot on the brake, but he was thrown off before he had any time to apply it; that between Wilkinsonville and the time he felt the car drop Lynch did not need to put on the brake, and operated the car in an easy and the usual manner.

Stanley Kalwarczyk, called by the plaintiff, testified that at the time of the accident he had been working for the defendant about twenty years and was so working at the time of the accident; that he and the other members of Lynch's section gang put the tools on the side of the car in the usual place; that after leaving Wilkinsonville "we went about two and one half miles until we got that shake" (the witness then shook his hands sideways and then up and down); that after the car left the rails it went off the bank into the water; that he (the witness) fell on top of Lynch; that no tools fell out of the car before it started to shake; that he saw nothing on the track at any time before the accident. On cross-examination this witness testified that the car was loaded at Webster, and two lining bars were picked up at Wilkinsonville and were put on the sides of the car; that "A lining bar is a rail bar about five or six feet long and about three inches around." This witness further testified that the motor car worked all right up to the time of the accident.

Harold W. Chandler, called by the defendant, testified in part that on the day of the accident he was a member of Lynch's section gang; that the motor car involved in the accident was received in April, 1930; that it was started with a crank and had a friction clutch; that it was used on the section right along; that it worked perfectly so far as he could see; that he never heard Lynch complain about it; that Lynch wanted a seat for it, and a seat came but the witness did not know who put it on; that Lynch supervised the care of this car; that Lynch had him oil it and see that the spark plugs were clean, and he did the cranking, and all that was done was under the supervision of Lynch, who had full control of the car. This witness further testi-

fied that the work to be done the day of the accident was first to change a rail at North Grosvenordale, and then level the track the rest of the day; that after the car was loaded Lynch took the driver's seat and he (the witness) cranked it. This witness, after describing the place on the car where the tools were put and the position of the men, testified as follows: At Wilkinsonville they stopped and picked up two lining bars which were placed on the right-hand side of the car. The first he felt that anything was wrong was that "The motor kind of slowed up, kind of quick and then there was a kind of shimmy, then the car flopped over, as near as I can tell. This happened . . . about two rails; two and one half rails in length." The witness landed on the roadbed beside the ties on his hands and knees. He saw Lynch lying on the track. About three weeks after the accident he saw a few marks on the ties; the first he saw "looked like a little chip off one of the ties and then there was a few ties, I couldn't tell, something tracked over the ties, well, ran over the ties. I could see the line over a few ties. The first mark was about three rails from where the car went off." This witness further testified on cross-examination that at the time of the accident the motor car had been used about three months; that he never saw anything wrong with it before the accident; that at the time of the accident Lynch was operating the car at "the speed we usually operated, between twenty and twenty-five miles an hour"; that he saw nothing on the track at the place of the accident, or at any place; that he did not see any tools fall off the car; that it started to "shimmy" about three and one half rail lengths before it went off the track. On recross-examination he testified that the car "shook about three rails while it was on the track and then went about one rail length after it got off the track but before it went into the river, and then it went into the river."

An assistant superintendent called by the defendant testified that more than an hour after the accident he saw the motor car and the tools, and then walked up the track following some marks; that the first mark he saw

going north was where the car had been turned over, "and the tools were scattered along, and about ten feet above that there were marks of the wheels, where it had been derailed . . . that it was somewhere in the neighborhood of forty feet that the car had run derailed. Above that there were marks where something had dragged . . . about eighty feet"; that there were fifteen feet where there was only one small mark on the ties, and in the neighborhood of twenty feet above the last of the marks "there was a gouge as if something had dug in . . . Into the gravel and ties"; that the mark was on the side or top of the tie.

A witness called by the defendant testified that at the time of the accident he was a track supervisor in the employ of the defendant; that Lynch reported to him; that he arrived at the place of the accident shortly after eight o'clock on the morning it occurred and arranged for removal of the men involved in the accident; that he made notes of the condition of the track; that three days later he took the motor car out of the river; that he found some marks on the ties back of the point of derailment; that he went back half or three quarters of a mile; that at a point ninety-six feet behind where Pecherina's body was found there was an indentation on the north side of a tie, probably one half inch below the top of the tie, a blunt indentation or puncture which had splintered the edge of the tie a trifle, approximately one foot inside the right-hand rail in the direction the car was travelling; that from there on there were no more puncture marks. This witness further testified that "Considering the tie that had the puncture mark in it as the first, the next mark was on the twelfth tie; that was nineteen and three-tenths feet south of the first mark. The next mark was on the sixteenth tie, twenty-five and six-tenths feet south of the first mark. Thereafter every tie was marked up to and including the thirty-fourth tie. There was also what I determined to be flange marks of the wheels of the car on the ties. That was on the twenty-ninth tie south of the first mark, forty-seven and seven-tenths feet from the first flange marks, the wheels indicating to me the car had left the rails at that point. Flange

marks showed one mark outside the rail nearest the river and the other inside of the east rail.  They continued seventy-one feet south of the . . . first tie mark, to a point where there was a mark on the rail that showed the entire car left the track at that point.  The east wheels of the car went over the west rail of the track at that point and the car went into the river one hundred nine feet south of the first mark, or sixty-one feet south of the derailment." This witness further testified that he found a bent bar at the place of the accident and that it had been in his possession ever since;  that he would say it was the same bar shown at the lower left side of the plaintiff's Exhibit 2;  that it probably weighed ten or fifteen pounds and was about five feet long.

One Lane was called as a witness by the defendant.  He testified that he was a sales and service engineer for Fairbanks, Morse & Co.;  that he was familiar with motor cars numbered 44B used on sections;  that they were first manufactured in 1927 and were being manufactured by the company in 1930;  that the defendant bought several;  that he put each one in service, instructing the operator;  that he instructed the decedent Lynch in April, 1930;  that when the motor car was left with the defendant it was operating all right;  that the same type of cars, 44B, "were used all over railroads in the spring of 1930."

One Bushnell, called by the defendant, testified that he was a gas engine mechanic employed by the defendant;  that he helped to install the motor car which was operated by Lynch at the time of the accident;  that he showed him how to operate it, and how to lubricate and handle it properly;  that he had known Lynch for six or seven years and Lynch had been operating a motor car before this time;  that he made an inspection of the motor car involved in the accident in May, 1930 — about two weeks after it had been installed;  that it was operating properly and Lynch did not make any complaints about it;  that he next saw the motor car on July 15 or 16, 1930, after the accident — it was loaded on a flat car;  that after it was taken from the river he examined it and found that certain parts were

bent; that if the brakes were in good condition and upon a track similar to that where the accident occurred it could be stopped in thirty-three feet.

Certain rules of the defendant were admitted in evidence including Rule 735 which provides in part that a motor car must be operated by the foreman or man in charge of the gang; Rule 736, "Cars must nót be run faster than 20 miles per hour and then only where view is unobstructed and the way is known to be clear"; and Rule 744, "Track jacks or other tools liable to fall off must not be carried on the forward end of cars . . . ."

After a verdict was returned for the plaintiff, subject to leave reserved under G. L. (Ter. Ed.) c. 231, § 120, the defendant moved that a verdict be entered in its favor upon the following grounds: "(1) Because there is not sufficient evidence to justify a finding of negligence on the part of the defendant, its servants or agents; (2) Because there is not sufficient evidence to warrant a finding that there was any defect in the equipment of the defendant or that it was insufficient; (3) Because under the facts in this case the plaintiff's intestate assumed the risk of injury; (4) Because under the company's rules, especially Rule 744, it was the duty of the section foreman, the plaintiff's intestate, to see that materials carried on hand or motor cars were properly secured in a manner to prevent any possibility of their falling from the car; (5) Because under the facts in this case the doctrine of *res ipsa loquitur* does not apply; (6) Because the action contained in each count of the substituted declaration was not commenced within two years from the day the cause of action accrued as required by the terms of the Federal employers liability act, so called." The motion was allowed, and a verdict for the defendant was entered. To the allowance of the motion the plaintiff excepted.

The motor car which was operated by Lynch at the time of his death was purchased in April, 1930, and had been operated less than three months before the accident; it had been purchased of a reputable manufacturer, and approximately two thousand cars of a similar type were in

use on railroads all over the country; up to the time of the accident it was in good condition.   Lynch always operated the car and was competent for that purpose; there was no evidence to the contrary.   There was no evidence of negligence on the part of the defendant as distinguished from Lynch — the defendant's employee who operated the car at the time of the accident.   It was said by this court in *Shipp* v. *Boston & Maine Railroad*, 283 Mass. 266, at page 270: "Apart from matters of procedure not affecting substantive rights (*Lee* v. *Central of Georgia Railway*, 252 U. S. 109, 110), the 'case is governed by the Act and the applicable principles of common law as established and applied in federal courts.' *Missouri Pacific Railroad* v. *Aeby*, 275 U. S. 426, 429.   According to these principles the defendant was not 'held to an absolute responsibility for the reasonably safe condition of the place, tools and appliances, but only to the duty of exercising reasonable care to that end.' *Baltimore & Ohio Southwestern Railroad* v. *Carroll*, 280 U. S. 491, 496."

The contention of the plaintiff that the doctrine of *res ipsa loquitur* applies cannot be sustained.   Negligence of the defendant cannot be inferred from the circumstances of the occurrence that caused the injury.   It was said in *Wilson* v. *Colonial Air Transport, Inc.* 278 Mass. 420, at page 425: "The principle of *res ipsa loquitur* only applies where the direct cause of the accident and so much of the surrounding circumstances as were essential to its occurrence were within the sole control of the defendants or of their servants.   *Reardon* v. *Boston Elevated Railway*, 247 Mass. 124. . . . the presumption raised in favor of the plaintiff by the application of the doctrine, *res ipsa loquitur*, is one of evidence and not of substance, and . . . the burden of proof remains during the trial upon the plaintiff."   In reference to this doctrine it was said in *Shipp* v. *Boston & Maine Railroad*, 283 Mass. 266, at pages 272–273: "But whatever may be the applicability of this doctrine under some conditions . . . this is not a case where negligence of the defendant can be inferred from 'the circumstances of the occurrence that has caused the injury.'   See *Sweeney* v.

*Erving*, 228 U. S. 233, 238." Negligence "ordinarily cannot be inferred from the happening of an accident to an employee or from the discovery in a machine or other instrumentality of a latent defect for which under the existing circumstances no responsibility can be imputed to the employer. There is no liability for injury to a servant unless there has been some negligence for which the master is liable." *Chiuccariello* v. *Campbell*, 210 Mass. 532, 534. See also *Ryan* v. *Fall River Iron Works Co.* 200 Mass. 188.

There was evidence that about two months before the accident an angle bar fell off the car. In view of the evidence of marks on the ties above the place where the car was derailed, it could have been found that one end of the bent bar which was found at the place of the accident and is shown on the left side of the plaintiff's Exhibit 2 had dropped down from the car and caught on the ties and caused the derailment. Unless the car left the track for this reason, or because of excessive speed, no cause for the derailment appears. If it was due to either cause the accident may well have been due solely to negligence of Lynch himself. The fact that there was an accident creates no presumption of negligence on the part of the employer in an action brought by an employee. It was said in *Patton* v. *Texas & Pacific Railway*, 179 U. S. 658, at page 663: ". . . in the case of a passenger the fact of an accident carries with it a presumption of negligence on the part of the carrier, a presumption which in the absence of some explanation or proof to the contrary is sufficient to sustain a verdict against him, for there is *prima facie* a breach of his contract to carry safely . . . a different rule obtains as to an employé. The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employé to establish that the employer has been guilty of negligence." See also *New York Central Railroad* v. *Ambrose*, 280 U. S. 486; *Shipp* v. *Boston & Maine Railroad*, 283 Mass. 266. The doctrine of *res ipsa loquitur* is not applicable to the case at bar because of the fact that the car and the tools upon it were under the exclusive control and management of Lynch

at the time of the accident. *Courtney* v. *New York, New Haven & Hartford Railroad,* 213 Fed. Rep. 388. In the case last cited the plaintiff was injured by the explosion of an oil lamp, which he was filling, on a locomotive engine. It was said by the court at page 390: "The reason why this rule of law [*res ipsa loquitur*] is not applicable to the case at bar is because of the fact that the thing causing the accident, namely, the oil being poured into the lamp, was in exclusive control of the plaintiff rather than of the defendant, and therefore the reason for the rule does not exist. . . . The maxim res ipsa loquitur does not apply where the accident might have been due to improper handling as well as to improper furnishing the thing causing the accident." In cases decided by this court where *res ipsa loquitur* has been held to apply, the thing which caused the injury was controlled by the defendant and not by the injured party. *Ryan* v. *Fall River Iron Works Co.* 200 Mass. 188. *Chiuccariello* v. *Campbell,* 210 Mass. 532. It was said in *Ragolsky* v. *Nurenberg,* 211 Mass. 575, at page 576: "We have here the mere occurrence of an accident. To infer from that alone that it was caused by the negligence of the defendants would be to assume the very issue which the plaintiff is obliged to prove. This is not a case of *res ipsa loquitur,* where we can say that in the ordinary course of things such an accident could not happen unless from careless construction, inspection or use attributable to the employer." In that case, as in the case at bar, there was no evidence of previous trouble in the operation, none of defect in condition or adjustment, none of lack of proper inspection. It is plain that under the Federal decisions and those of this court the evidence would not warrant a finding of negligence on the part of the defendant. *Patton* v. *Texas & Pacific Railway,* 179 U. S. 658. *New Orleans & Northeastern Railroad* v. *Harris,* 247 U. S. 367. *Lee* v. *Central of Georgia Railway,* 252 U. S. 109. *Chicago, Milwaukee & St. Paul Railway* v. *Coogan,* 271 U. S. 472. *Missouri Pacific Railway* v. *Aeby,* 275 U. S. 426. *Ryan* v. *Fall River Iron Works Co.* 200 Mass. 188. *Chiuccariello* v. *Campbell,* 210 Mass. 532. *Ragolsky* v.

*Nurenberg,* 211 Mass. 575. *Wilson* v. *Colonial Air Transport, Inc.* 278 Mass. 420. *Shipp* v. *Boston & Maine Railroad,* 283 Mass. 266. The defendant's exceptions have become immaterial. They may be dismissed without consideration.

> *Plaintiff's exceptions overruled.*
> *Defendant's exceptions dismissed.*