JOHN M. LLOYD v. ALTON RAILROAD COMPANY, Appellant.—No. 38613.
—175 S. W. (2d) 819.

Division One, November 1, 1943.

Rehearing Denied, December 6, 1943.

*Charles M. Miller* for appellant.

1158

*Charno & Drummond, John A. McGuire* and *Ira B. Burns* for respondent.

1162

1164

 BRADLEY, C.—Action under the Federal Employers Liability Act, 45 U. S. C. A., Secs. 51 et seq., to recover for personal injuries. Verdict and judgment went for plaintiff for $15,000, and defendant appealed.

This is the second appeal in this cause. At the first trial the verdict was for defendant, but the trial court granted a new trial and defendant appealed. The order granting the new trial was affirmed. Lloyd v. Alton Railroad Co., 348 Mo. 1222, 159 S. W. (2d) 267.

Plaintiff was a bridge carpenter, and resided in Slater, Missouri, when injured. The injuries resulted when a motorcar on which he was riding struck a dog and was derailed in Carrolton, Illinois, about 7:30 A. M., June 8, 1938.

The negligence alleged and submitted was that Harry Poynter, operator of the motorcar, failed to exercise ordinary care to slacken the speed of or stop the motorcar, and excessive speed. These grounds were submitted in the alternative and in separate instructions. Defendant answered by a general denial, and an allgation that the cause "is governed and controlled by the law of the State of Illinois where the alleged accident occurred."

Error is assigned (1) on the refusal, at the close of the case, of defendant's instruction in the nature of a demurrer to the evidence; (2) on the admission of evidence; and (3) on giving and refusing instructions.

The demurrer to the evidence raises two questions, viz., Was plaintiff, at the time of injury, engaged in interstate transportation or in work so closely related thereto as to be practically a part of it? and, Was there substantial evidence to support submission?

██ ██ Was plaintiff, at the time of injury, engaged in interstate transportation or in work so closely related thereto as to be practically a part of it? On the prior appeal, defendant did not contend to the contrary. In the present brief defendant says that on the prior appeal "we were confident that plaintiff made no case for the jury" on the question of negligence, and for that reason defendant did not press the question as to whether plaintiff's case was properly under the federal act. It is conceded that defendant is not precluded from now contesting the question, although such was not pressed on the prior appeal.

For about a week prior to June 8, 1938, the bridge gang had been engaged in rebuilding a freight platform or dock at East [821] Hardin, Illinois. W. J. Leeson was foreman of the gang and Harry Poynter was assistant foreman. June 7, foreman Leeson received a telegram from Chas. E. Horrom, the master carpenter, to meet Horrom at Roodhouse, Illinois, at 8 A. M., June 8, in order to make a bridge inspection trip on the Tonika line. It was stipulated that

both intra and interstate shipments were transported over the Tonika line. The line from East Hardin to Carrolton is a branch line and Carrolton is about 19 miles northeast of East Hardin. Roodhouse is about 22 miles north of Carrolton. Godfrey is south of Carrolton, distance not given. The inspection was to be made between Godfrey and Roodhouse.

The bridge gang ate and slept in the cookcar, then at East Hardin, and there was also a toolcar. Plaintiff testified that about 7 A. M., June 8, he started to get his tools to go to work, and that Leeson said to him, "John, you come and go with me on this inspection. Q. He said, what? A. Come go with me on this inspection on the Tonika line. He first said, 'Come and go with me', and I said, 'Where to', and he said, 'on this inspection trip on the Tonika line.' Q. On this morning that Mr. Leeson had told you to come go with him on this inspection trip, what did you do? A. .I was getting my tools out of the box and I put them down and went and got on the car with him and Poynter. . . . Q. When you speak of this inspection trip, what do you mean? A. That means inspecting bridges . . . Q. On these inspection trips would the crew stop at those bridges? A. Yes, sir."

The weight of the motorcar was about 600 or 800 pounds, and it required at least two men to move it from the tracks in the event such became necessary to permit a train to pass, and it was plaintiff's understanding that he was going on the inspection trip for the purpose of assisting in moving the motorcar from the track in the event such became necessary while on the inspection trip. Plaintiff testified: "Q. Now, on your work there, you never went along and inspected bridges, did you? Inspection wasn't a part of your work, was it? A. No, sir, that would not have been part of my work. What I went along for was to assist to take the car on and off the track. . . . Q. You never did go on the trip to inspect bridges, did you, yourself? A. No, sir, that is not the men's job, inspecting bridges. Q. That was more for the bridge engineer? A. That is right."

Mr. Horrom was a witness at the first trial, but was dead at the time of the second trial. Plaintiff introduced from the record of the first trial a part of Horrom's evidence, and from that it appears that Horrom said that they were going on the inspection trip on *the* motorcar, and there is nothing to show that he did not mean *the* motorcar upon which plaintiff was riding at the time of his injury.

Defendant contends that plaintiff went along "solely for the purpose of assisting Poynter in taking the car off the track in case it became necessary when Poynter and plaintiff were returning from Roodhouse to East Hardin, Leeson remaining in Roodhouse." The evidence of Leeson and Poynter tends to show that such was the purpose of plaintiff's going, or starting, from East Hardin to Roodhouse.

It is pointed out in Shanks v. Delaware, L. & W. R. Co., 239 U. S. 556, 36 S. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797, that "the true

test of employment in such commerce in the sense intended (by the statute) is, Was the employee, at the time of the injury, engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?" See also, Chicago & N. W. R. Co. v. Bolle, 284 U. S. 74, 52 S. Ct. 59, 61, 76 L. Ed. 173; Chicago, B. & Q. R. Co. v. Harrington, 241 U. S. 177, 36 S. Ct. 517, 60 L. Ed. 941; and Chicago & E. I. R. Co. v. Industrial Comm. of Ill., 284 U. S. 296, 52 S. Ct. 151, 76 L. Ed. 304, 77 A. L. R. 1367.

In Pedersen v. Delaware, L. & W. R. Co., 229 U. S. 146, 33 S. Ct. 648, 57 L. Ed. 1125, the plaintiff was struck by a train while carrying a sack of bolts from a toolcar to a bridge used in interstate transportation, which bridge was being repaired. It was held that the plaintiff's case was properly under the federal act.

It is held in Montgomery v. Terminal R. Assn., 335 Mo. 348, 73 S. W. (2d) 236, l. c. 240, that "it is in harmony with the Pedersen case to hold that an employee, making a trip for the purpose of policing or inspecting tracks and bridges used by interstate trains for the purpose of insuring their [822] maintenance in operative condition, or supervising work for that purpose, is engaged in work so closely related to interstate transportation as to be practically a part of it", citing Chesapeake & O. Ry. Co. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; Louisiana R. & N. Co. v. Williams (C. C. A.), 272 Fed. 439; Sells v. A., T. & S. F. R. Co., 266 Mo. 155, 181 S. W. 106; 2 Roberts' Federal Liability of Carriers, 1485, Sec. 774.

"It is settled that the repair of bridges or other structures constituting part of a railway in use as an instrumentality of interstate commerce is so closely related to such commerce as to be in legal contemplation a part of it, that a railway employee engaged in such work is to be regarded as engaged in interstate commerce, and that preparatory steps taken with the purpose of furthering the actual work of repair or reconstruction constitute a part of such commerce within the meaning of the act." Kansas City Southern Ry. Co. v. Martin, 262 Fed. 241, l. c. 242.

In the prior opinion we ruled [159 S. W. (2d) l. c. 271] that in determining the sufficiency of the evidence to make a submissible case for a plaintiff, in actions under the Federal Employers Liability Act, "we are governed by the test announced by the decisions of the federal courts", citing Weaver v. Mobile & Ohio R. Co., 343 Mo. 223, 120 S. W. (2d) 1105. Of such ruling, defendant, in the present brief, says that we "overlooked the pleading in plaintiff's petition wherein he pleaded, as to his grounds of negligence, the Illinois law. . . ."

The Federal Employers Liability Act does not define negligence and the question of negligence in a cause under the act is governed by common law principles as established and applied in the federal courts. Martin v. Wabash Ry. Co., 325 Mo. 1107, 30 S. W. (2d) 735, l. c. 741; Jenkins v. Wabash Ry. Co., 335 Mo. 748, 73 S. W. (2d) 1002, and cases there cited; Sweany v. Wabash Ry. Co., 229 Mo. App. 393, 80

S. W. (2d) 216; Lynch v. New York, N. H. & H. R. R. Co., 294 Mass. 152, 200 N. E. 877; Kansas City Southern Ry. Co. v. Larsen, 195 Ark. 808, 114 S. W. (2d) 1081, 1. c. 1085, certiorari denied, 305 U. S. 621, 59 S. Ct. 82, 83 L. Ed. 307. It was not necessary for plaintiff to plead the Illinois law, but such would not make the Illinois law govern.

Plaintiff's evidence tends to show that, at the time of injury, he was on the way to assist in removing the motorcar from the track, if such became necessary, during the *actual* inspection of bridges used in interstate transportation, and the question as to whether he was engaged in interstate transportation or in work so closely related thereto as to be practically a part of it, was, we think, one for the jury.

Was there substantial evidence to support the charge that Poynter failed to exercise ordinary care to slacken the speed of or stop the motorcar? At the first trial the cause was submitted only on the alleged failure to slacken speed or stop. We held that a submissible case was made, and plaintiff, on the present appeal, makes the point that the prior ruling on the issue of failure to slacken speed or stop is the law of the case on such issues. Defendant says, however, that there was "new and different evidence", and additional witnesses; that "due to press of business" on the first appeal, we fell into error "in holding plaintiff made a case for a jury."

From plaintiff's evidence, in the present record, the pertinent facts on the issues of failure to slacken speed, or to stop, are these: On the way from East Hardin to Carrolton, operator Poynter sat about the center of the car, "just back of the levers", and faced to the front. Plaintiff sat at the right rear and Leeson at the left front. The operator's seat was about 4 inches higher than the seats of Leeson and plaintiff, and the operator was about three and one-half feet above the rails, and "had a good vision, except right up in front of the motorcar. Naturally, he could not see through the windshield." The windshield had been glass, "but the company (defendant) made them take the glass out of it and there was a black canvas cover where the glass was. He (the operator) had good vision to the sides. He could see right up to the car."

Plaintiff further testified: "Q. When you come into Carrolton, do you come in on a straight track or a curve? A. There is a curve as you come into Carrolton. Q. Did they ever slow down the speed of that car before this accident? A. Yes, sir. Q. When and where? A. About 300 or 400 yards back from where the accident happened, he slowed down just as he come around the curve. Q. That was just as you came around the curve? A. Yes, sir. [823] Q. And what was it slowed to? A. I would judge around 30 miles an hour. Q. Did it continue on at that speed to the accident? A. No, sir. Q. What happened then? A. About 150 feet—125 or 150 back (from point of collision) he slowed it down to 25 miles per hour. . . . Q. Did you see any dog at any time there? A. I did, after we came around

this curve there, yes, sir. Q. About how far before you got to the point of accident? A. About 125 feet (the track was straight at point of accident). Q. And where was this dog? Over in the back yard of a house there. Q. Which side of the track? A. On the right hand side of the track, south side, or southeast, whichever it would be there. Q. Did that back yard come close to the track? A. Yes, sir, right up to the right of way. . . . Q. So when you first saw this dog in that yard, how far were you from the point of collision? A. About 125 feet. Q. How far was he from the rail? A. From the rail, I would say around 50 feet, 50 or 60 feet. Q. What kind of a dog was it? A. He was a yellow shepherd dog. Q. How tall? A. Twenty-two or twenty-four inches. Q. When you first saw this dog,. what was he doing? A. He was coming toward the railroad. Q. How was he coming? A. In a gallop (about 12 miles per hour). Q. What did you do when you saw him? A. I didn't do anything when I saw him. Q. Did you continue to watch him? A. Yes, sir.''

Plaintiff further testified: ''Q. Then what happened thereafter? A.' Well, he kept right on coming headon right towards the railroad. Q. Directly toward it? A. Directly toward the railroad. Q. Did he change his speed any? A. No, sir. Q. What happened with respect to you and the car? A. Well, the car hit the dog. . . . Q. Now, Mr. Lloyd, after you saw this dog 125 feet away, did you say anything to anybody and if so, where? A. I did about when we got about 50 or 60 feet of where we hit the dog, I spoke to Poynter about the dog, I said, 'Look out for the dog', and he said, 'O. K., I see it.' Q. Where was the dog then? A. He was coming toward the railroad track just like the devil headon (''just like the devil'' was stricken). Q. Did he change his speed any? A. No, sir. Q. Where was he with reference to the railroad track when you spoke to Poynter? A. He was about 18 or 20 feet from the track. Q. You were about how far from the point of collision when you spoke to Poynter? A. About fifty or sixty feet. Q. Other than Poynter saying, 'O. K. I see it', was anything else said? A. That is all. Q. Did he slacken the speed of the car any? A. No, sir. Q. Did he make any movement to slacken the speed? A. No, sir. Q. Did the car change its speed any? A. No, sir. Q. Did the dog .change its speed or direction any? A. No, sir. Q. Go ahead and tell what happened from then on after you spoke to Poynter? A. Well, the dog came right on to the track—. . . Q. What happened when the car hit the dog? A. The car hit the ground, was derailed. It threw me off the seat down onto the footboard and I don't know whether the car hit a high tie or what, but it swerved the back end and that is the last I know. I didn't know what happened from there on. Q. When did you next know anything? A. The next thing I knowed was in the hospital. . . .

''Q. Now take that car with you three men on it, going at that speed (25 miles per hour) on a rail like that, what distance could

that car be stopped by use of all brakes and appliances there with safety to you men on the car? A. About 30 or 35 feet. Q. You have driven that car, haven't you? A. A little. Q. Did you drive any others like it? A. Yes, sir."

Plaintiff introduced defendant's rule 6 pertaining to the operation of motorcars. **[824]** Rule No. 6 provides: "Keep constant lookout for dogs, chickens, hogs, or other animals which are apt to be struck and derail car. Also, for objects such as stones and sticks on rails." Leeson and Poynter, as witnesses for defendant, testified that the motorcar, at the time of the accident, was running about 15 miles per hour, and each said that he did not see the dog prior to the collision and not until the motorcar stopped, some 50 or 60 feet from the point of collision and derailment. Also, each denied that plaintiff said anything about the dog. On cross-examination, each said that he was not looking to the side, but straight ahead.

The evidence at the second trial, on the issues of Poynter's alleged failure to slacken speed or stop, was substantially the same as at the first trial. It is true that there are, in the present record, some additional facts and some new witnesses were used, and there are some slight variations here and there, but basically the evidence is substantially the same. Plaintiff, at the second trial, introduced the rule, supra, and defendant used as witnesses the owners of the dog.

We are not convinced that the ruling on the question of negligence involved in the prior appeal was wrong, hence that ruling is the law of the case on the question of the alleged failure to slacken speed or to stop, and we make reference to that ruling without repeating here. Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079; Kick v. Franklin et al., 345 Mo. 752, 137 S. W. (2d) 512.

■ . Was there substantial evidence to support submission on the issue of excessive speed? Defendant says that the speed of the motorcar "was not a proximate contributing cause" of plaintiff's injuries, and that the evidence does not support submission on the theory of excessive speed. Plaintiff's instruction No. 3 told the jury that if they found that "said motorcar was operated at a speed of 25 miles per hour or more, and that under the facts and circumstances . . . the operator was negligent in running the same at an excessive and not reasonably safe rate of speed, and . . . that such negligence, if any, directly contributed . . . to cause the collision", then to find for plaintiff.

The line from East Hardin to Carrolton was a branch line, and not in condition to run the motorcar "very fast" thereon, according to Leeson. Of this, Leeson testified:

"Q. Then when you got onto the track after you left the Y (at Bakersfield, between East Hardin and Carrolton), you opened it up a little more, Mr. Poynter did, went faster? A. That track is a branch line and you can't run very fast down there. Q. I didn't

ask you that. Did you run fast? A. We might have run 25. There is no speedometer on there. You can't tell how fast you run. Maybe some places we got up to 30. Q. And you might have gotten up to 35 some places? A. No, sir, not down there. Q. That car will run 35? A. Yes, sir, but whether it would stay on down there on that old— Q. (interrupting) It will run forty miles on that track? A. No, sir. Q. It will run 35? A. No, sir. Q. How fast will it run? A. It will run thirty."

Plaintiff, on the issue of excessive speed, introduced defendant's rule 8, which says "run carefully around curves and not to exceed fifteen (15) miles per hour at any time." Defendant says that the speed limit in the rule. applies only to curves. It will not be necessary to rule the point on the application of the rule, and we do not.

It appears that the impact was so violent that both Leeson and plaintiff were thrown from the motorcar; Poynter was so upset he "couldn't get hold" of the brake; the motorcar ran some 50 or 60 feet on the ties before it stopped, and the front axle was bent. According to Leeson the speed limit for the motorcar on this branch line was 30 miles per hour, and clearly, when interrupted, he had in mind to say something about the motorcar staying on the track at a speed of 35 miles per hour. The implication is that he had his doubts about it.

The inference might be drawn from Leeson's evidence that the track, at the place of collision, was not in good condition. Had the motorcar been running at a lesser speed it might not have been derailed, and if it had not been derailed, plaintiff might have escaped injury. These, we think, are legitimate inferences. We do not think it was error to submit the issue of excessive speed.

█ Plaintiff was injured prior to the amendment of August 11, 1939, 45 U. S. C. A., Sec. 54, and defendant makes the point that plaintiff assumed the risk. That defense [825] was not pleaded, and the point is not before us. Defendant's demurrer to the evidence was, we think, properly refused.

█ On the admission of evidence: The evidence excluded pertained to the actions and conduct of the dog involved on prior occasions. In the brief defendant says: "The court refused to admit this evidence for the stated reason that it was not shown that Poynter, the operator of the railroad motorcar, had any knowledge of such prior action of the dog." Defendant sought to prove, by the owners of the dog, (1) that on prior occasions, the dog, when motorcars were passing, would approach to within 10 or 15 feet of the track and stop and bark; (2) that he had the habit of chasing automobiles, but that he never got in front of them. As supporting the assignment based on the exclusion of this evidence, defendant cites Golden v. Chicago, R. I. & P. R. Co., 84 Mo. App. 59; Broderick v. Higginson, 169 Mass. 482, 48 N. E. 269; Mitchell v. Central Vermont Ry. Co., 261 Mass. 29, 158 N. E. 336; Forsythe v. Kluckhohn, 161 Iowa, 267, 142 N. W. 225; 1 Wigmore On Evidence (3rd Ed.), Sec. 68a.

In the Golden case, supra, a team of horses became frightened at a pile of lumber. It was held that evidence that horses, other than those involved, got frightened at the lumber pile was competent. The Broderick case, supra, was to recover for personal injuries caused by the defendant's dog attacking a team driven by the plaintiff. In that case it was said that "there is a probability that an animal will act as he is accustomed to act under like circumstances. For this reason, when disputes have arisen in regard to the conduct of an animal, evidence of his habits in that particular has often been received."

The Mitchell case, supra, was to recover for injuries resulting from being thrown from a load of ties when a team of horses became frightened at the blowing of a locomotive whistle. It was held, in the situation, that evidence as to the disposition of the horses before and after the accident was competent.

The Forsythe case, supra, was to recover for injuries caused by being thrown down by the defendant's dog. Evidence that the dog, on other occasions, had committed the same acts charged in the complaint was competent as tending to sustain the charges made. 1 Wigmore On Evidence (3rd Ed.), Sec. 68a deals with the subject of the admissibility of evidence as to the disposition of animals.

We do not think that there is anything in either of the cases cited by defendant that supports the assignment on the exclusion of evidence.

In the prior opinion we said [159 S. W. (2d) l. c. 272] : "We must assume that the operator of the car was familiar with the ordinary habits and natural instincts of dogs, including collies (Restatement of the Law of Torts, Chap. 2, Sec. 290, p. 780) and particularly of their tendency to run after noisy moving vehicles and of their habit of running in front of stock (unless trained) and in front of teams and wagons, motorcycles and other motor vehicles. It is a matter of common knowledge that dogs will run beside or in front of vehicles in all cases, except where the speed of the vehicle is too great; and that they will run behind vehicles only when they cannot run beside or in front of them."

Defendant, in the brief, argues that the excluded evidence "tended to disprove what the court asserted as judicial knowledge that dogs would run in front" of vehicles. Such evidence would not have so disproved. It would have tended to show that the dog involved here may have been more cautious than the average dog, but unfortunately Poynter did not know about this and was not entitled to assume that the dog would repeat his prior acts of caution.

We find no merit to the assignment based on the exclusion of evidence.

On instructions: Error is assigned on plaintiff's instructions 1, 2, and 3, and on the refusal of defendant's instructions G, H, I, J, L, M, N, O, P, Q, R, S, T, U, V, and W.

▆ Defendant says that there was no substantial evidence to support instruction No. 1. Instruction No. 1 submitted the question as to whether or not plaintiff was engaged in interstate transportation, or in work so closely related thereto as to be practically a part of it. In ruling the demurrer, supra, we disposed of this assignment.

Instruction No. 2 submitted the question of Poynter's alleged negligence in failing to slacken speed or stop. The principal complaint on instruction No. 2 is that it is not supported by the evidence. That question was also ruled in disposing of the demurrer to the evidence. It is also claimed [826] that instruction No. 2 is abstract and misleading and conflicts with plaintiff's instruction No. 3. We do not think that there is merit in these complaints.

Instruction No. 3 submitted the excessive speed theory. A complaint made on this instruction, as on instructions 1 and 2, is that it is without evidentiary support. That question was disposed of in ruling the demurrer. Also, it is contended that instruction 3 was in conflict with instruction 2, and was a roving commission. We find no merit in these complaints on instruction 3.

Defendant complains on the refusal of 16 instructions, lettered as above. "The prime object of instructions is not to test the accuracy of the circuit judge in passing upon them, but to afford the average layman of the jury a clear and plain view of the legal principles, applicable to the case, by which he may be guided to a just result. That is their true purpose. Trial judges should insist that it be kept in view. That important part of the proceedings on the circuit should not be allowed to degenerate into a mere wrestle for advantage on an appeal." Blanton v. Dold et al., 109 Mo. 64, l. c. 77, 18 S. W. 1149. Certainly a multiplicity of instructions is not to be commended. Crawshaw et al. v. Sumner, 56 Mo. 517.

To separately rule the complaints on all the refused instructions, upon which complaint is made, would extend this opinion beyond reasonable limit. We have endeavored to carefully examine into the complaint on each of the refused instructions of which complaint is made, and it is sufficient to say that we find no substantial merit in the complaints on these instructions. However, it is necessary to deal with refused instruction W, which follows:

▆ "The court instructs the jury that if you believe and find from the evidence that plaintiff, at the time in question, was only to go on the railroad motorcar from East Hardin, Illinois, to Roodhouse, Illinois, for the purpose of taking Mr. Leeson to Roodhouse, Illinois, and then immediately returning from Roodhouse to East Hardin, on the motorcar with Mr. Poynter, then your verdict must be in favor of the defendant." This instruction is based on the evidence of Leeson and Poynter, as appears, supra.

In Garrison v. Thompson et al., 344 Mo. 579, 127 S. W. (2d) 649, the plaintiff was injured when a motorcar, upon which he was riding, jumped the track while water pocket ties were being transported.

Ultimately, these ties. were to be driven into the roadbed, and· the work of driving the ties into the roadbed was admittedly *work* under the federal act. Eight separate. movements of the ties were necessary before they were to be actually driven into the roadbed, and the plaintiff was injured in the second movement. It was held that the second movement was too remote to be practically a part of interstate transportation work.

In Fenstermacher v. Chicago, R. I. & P. R. Co., 309 Mo. 475, 274 S. W. 718, the facts were these·: It became necessary for the defendant to use two 45-foot telegraph poles in repairing its telegraph line at Trenton, Mo. Poles of that size, with other poles, were stored at Altamont. Plaintiff was a member of the bridge and building gang which was then engaged in work at Altamont. He, with others, was directed to assist in getting the two desired poles out of the pile of poles at Altamont, and to assist in loading the two poles on a flat car. It was necessary to move some poles in order to get to the two desired poles. While assisting in moving a pole, plaintiff was injured. The two 45-foot poles were loaded. on a flat car and taken to Trenton where they were unloaded. In two or three days these poles were used in repairing the telegraph line. The only connection that plaintiff had with the repair of the telegraph line was the work he was doing when injured. It was held· that plaintiff was not engaged in interstate transportation or in work so closely related thereto as to be practically a part of it. In ruling the question the court said [274 S. W. l. c. 720]:

"We are not in doubt that the telegraph line, by use in furthering and protecting interstate commerce, became definitely impressed with the character of an interstate facility, and that one engaged in operating or repairing such facility was· at least engaged in work so closely related to interstate commerce as to be a part of it. But this does not mean that one engaged in work, which will ultimately enter into the repair of such facility and thereby become a part of it, no matter how remotely, is engaged in work so closely related to interstate commerce as to be a. part of it."

In the Fenstermacher case it is pointed out that the work the plaintiff was doing, when injured, was removed from the actual work of repairing the telegraph line by at least three separate and distinct operations. [827] These operations are stated as follows: "After being loaded upon the flat car, the telegraph poles had to be hauled to Trenton. A second ·operation took place when they were unloaded there. A third operation took place when the poles were moved to the point where they were to be. used. And, if the persons who removed the poles from the unloading place at Trenton were not employees engaged in the actual repairs, the work of still other employees was involved. At least three such operations must have occurred before the actual work of placing the poles in the telegraph line could begin." Then the court said [274 S. W. l. c. 721]: "It is not

here necessary, and we will not undertake, to say where the line should be drawn; but we are convinced, from the trend of the decisions discussed, that such line must be drawn at some operation in the repair of a facility of interstate commerce nearer to and more closely connected with it than a task three or four times removed from actual work upon such facility."

In the present case, Horrom said that "we were going on an inspection on the motorcar to Godfrey, Illinois, and get the bridge engineer (Rich) and make an inspection of the condition of bridges and culverts on the way back to Roodhouse." And as appears, supra, Leeson and Poynter testified to the effect that the intention was that after the motorcar arrived at Roodhouse, plaintiff and Poynter were not to go any farther, but were to return on this motorcar to East Hardin. From the time Leeson left East Hardin he was *on the way* to make an inspection, and plaintiff, at that time, was doing *work* as closely related to interstate transportation work as was Leeson. Before the actual inspection could begin it was necessary to get Leeson to the point where it would begin, and from what Horrom said, the inference might be drawn that he and Leeson intended to make some character of inspection on the way from Roodhouse to Godfrey, and if so, then the inspection was to begin at Roodhouse. And if such be so, plaintiff's work, in getting Leeson to Roodhouse, was much closer to the actual inspection work than was the work of the plaintiffs in the Garrison and Fenstermacher cases, supra. And if the actual inspection was not to begin until Leeson arrived at Godfrey, the work of plaintiff in getting Leeson to Roodhouse was not as far removed from the work of actual inspection as was the case in the Garrison and Fenstermacher cases. Defendant's instruction W was, we think, properly refused.

The judgment should be affirmed, and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by Bradley, C., is adopted as the opinion of the court. All the judges concur.